In The


Court of Appeals


Sixth Appellate District of Texas at Texarkana



______________________________



No. 06-06-00100-CV


______________________________






THE STATE OF TEXAS FOR THE BEST INTEREST


AND PROTECTION OF G. B.





 


On Appeal from the County Court at Law


Hunt County, Texas


Trial Court No. M-08852




 




Before Morriss, C.J., Ross and Carter, JJ.


Memorandum Opinion by Chief Justice Morriss



MEMORANDUM OPINION


 G. B., a mentally ill resident of Collin County, reported that she had awakened in a
Greenville motel room while a man--whose identity was unknown to her and who had managed to
get into her room without her recalling how--was trying to force sex on her. This was part of the
evidence at a hearing in the County Court at Law of Hunt County which resulted in an order
temporarily committing G. B. for mental health services.

 G. B. appeals the trial court's order of commitment arguing that the evidence is legally and
factually insufficient to support the order. Because we hold the evidence is both legally and factually
sufficient, we affirm the trial court's order.

 A trial court may order a proposed patient to receive temporary inpatient mental health
services only if the fact-finder concludes from clear and convincing evidence that the proposed
patient is mentally ill and also satisfies at least one of subparagraphs (A), (B), and (C) of Section
574.034(a)(2) of the Texas Health and Safety Code:

 (2) as a result of that mental illness the proposed patient:


 (A) is likely to cause serious harm to himself;


 (B) is likely to cause serious harm to others; or


 (C) is:


 (i) suffering severe and abnormal mental, emotional, or physical distress;


 (ii) experiencing substantial mental or physical deterioration of the proposed patient's ability to function independently, which is exhibited by the proposed patient's inability, except for reasons of indigence, to provide for the proposed
 patient's basic needs, including food, clothing, health, or safety; and


 (iii) unable to make a rational and informed decision as to whether or not to submit to treatment.


Tex. Health & Safety Code Ann. § 574.034(a)(2) (Vernon 2003). Here, the trial court's written
order affirmatively found the State's allegations under (A) and (C) to be true. (1)

 G. B. does not challenge the determination that she was mentally ill. See Tex. Health &
Safety Code Ann. § 574.034(a)(1). She contends the evidence was insufficient to support these
findings: that she was likely to cause serious harm to herself (Section 574.034(a)(2)(A)); that she
was suffering severe and abnormal mental, emotional, or physical distress (Section
574.034(a)(2)(C)(i)); that she was experiencing a substantial mental or physical deterioration of her
ability to function independently (Section 574.034(a)(2)(C)(ii)); or that she was unable to make a
rational and informed decision as to whether to submit to treatment (Section 574.034(a)(2)(C)(iii)).

 The evidentiary standards for involuntary commitment are high. State ex rel. L.H., 183
S.W.3d 905 (Tex. App.--Texarkana 2006, no pet.); Harris v. State, 615 S.W.2d 330, 333 (Tex. Civ.
App.--Fort Worth 1981, writ ref'd n.r.e.). The State has the burden of establishing by clear and
convincing evidence that the proposed patient meets at least one of the additional criteria listed in 
Section 574.034(a)(2). See Mezick v. State, 920 S.W.2d 427, 430 (Tex. App.--Houston [1st Dist.]
1996, no writ). Clear and convincing evidence is that "degree of proof which will produce in the
mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be
established." State v. Addington, 588 S.W.2d 569, 570 (Tex. 1979).

 When court-ordered temporary mental health services are sought under Section 574.034(a),
specific requirements for clear and convincing evidence are imposed: the evidence must include
expert testimony and, unless waived, evidence of a recent overt act or a continuing pattern of
behavior that tends to confirm "(1) the likelihood of serious harm to the proposed patient or others;
or (2) the proposed patient's distress and the deterioration of the proposed patient's ability to
function." Tex. Health & Safety Code Ann. § 574.034(d) (Vernon 2003). An expert diagnosis,
without more, is not sufficient to confine a patient for compulsory treatment. Mezick, 920 S.W.2d
at 430. The State cannot meet its burden of proof without presenting evidence of the behavior of the
proposed patient that provides the factual basis for the expert opinion. See id. The recent overt act
or continuing pattern of behavior shown by the State must also relate to the criteria on which the
judgment is based. See T.G. v. State, 7 S.W.3d 248, 252 (Tex. App.--Dallas 1999, no pet.).

 In reviewing the legal sufficiency of the evidence where the burden of proof is clear and
convincing evidence, we consider all of the evidence in the light most favorable to the finding to
determine whether a reasonable trier of fact could have formed a firm belief or conviction that its
findings were true. In re J.F.C., 96 S.W.3d 256, 266 (Tex. 2002). We must assume that the trier
of fact resolved disputed facts in favor of its finding if a reasonable trier of fact could do so, and
must disregard all contrary evidence that a reasonable trier of fact could have disbelieved or found
to be incredible. Id.

 In reviewing factual sufficiency challenges, we review all the evidence in the record, both
supporting and opposing the trial court's findings. In re C.H., 89 S.W.3d 17, 27-29 (Tex. 2002). 
We must give due consideration to evidence the trier of fact could reasonably have found to be clear
and convincing. Id. at 25. Under the clear and convincing standard, we determine whether the
evidence is such that the trier of fact could reasonably form "a firm belief or conviction" as to the
truth of the allegations sought to be established by the State. Id. We must consider whether disputed
evidence is such that a reasonable trier of fact could not have reconciled that disputed evidence in
favor of its finding. J.F.C., 96 S.W.3d at 266. The trial court as the trier of fact is the exclusive
judge of the credibility of the witnesses and the weight to be given their testimony. In re Estate of
Canales, 837 S.W.2d 662, 669 (Tex. App.--San Antonio 1992, no writ).

 At the temporary commitment hearing, the State presented the testimony of Dr. Heath
Penland, who testified that G. B. had been diagnosed with bipolar disorder, manic with psychotic
features, with methamphetamine dependence. He testified that the methamphetamine dependence
made the mental conditions worse. After waking in the Greenville motel room with a man she did
not know, G. B. went to the Greenville emergency room complaining of exhaustion. Dr. Penland
testified that, after G. B.'s hospitalization, she had been constantly on the telephone, that other
patients requested to leave when around her, that family members reported she had overloaded their
voice mail, that other patients had labeled her as a "wild woman," and that G. B. had reported that
other patients and staff were trying to harm her. Dr. Penland testified that G. B. will get worse if not
treated, but also recognized that at present she can feed, bathe, and clothe herself. He also testified
that G. B. had been hospitalized for three consecutive years for these problems and that she had been
noncompliant with her prescription drug regimen for several months before arriving in the Greenville
emergency room. 

 Dr. Penland acknowledged that G. B. denied any thoughts of hurting anyone and that,
although she was physically agitated at times, she had not been physically aggressive. He also
agreed that she could receive treatment on an outpatient basis.

 In her testimony, G. B. agreed she needed medication, stated she would not hurt herself or
anyone else, and testified about how she had gotten to Greenville. G. B.'s testimony showed that she
had a poor relationship with her family and that she believed the relationship was their fault because
they believed things about her that were untrue. 

 The State's evidence in this case consisted of live testimony from Dr. Penland, and 
certificates from Dr. Penland and from Dr. Paul Lee. Penland's certificate describes G. B.'s mental
state as manic, hyperactive, and irritable, with no insight into her illness and with impaired judgment. 
It indicates she has been belligerent to staff and that she reported waking up in a motel room with
a man forcing himself on her, with no recall of how she got there. Penland also reports that G. B.
has been abusing methamphetamine daily. 

 Dr. Lee's certificate states that G. B. was very disorganized and irritable, that she acted
inappropriately in the unit, and that she had been reported by her family to have threatened suicide. 

 Dr. Penland testified to his concerns that G. B. was likely to cause serious harm to herself,
explaining that the reason for that was the impairment in her judgment caused by her mental illness,
exacerbated by her use of methamphetamine. Opinion, supported by facts, can support a
commitment order. In re J.S.C., 812 S.W.2d 92, 95 (Tex. App.--San Antonio 1991, no writ). 

 G. B.'s testimony surrounding the Greenville incident sets out an unusual series of events. 
According to G. B., she drove herself from Allen to McKinney to deposit a check. Then the
McKinney police took her to the Samaritan Inn in McKinney, and someone there took her the thirty
miles to Greenville and dropped her off at the Greenville Shelter, from which she went to the
emergency room. According to G. B., after she left the emergency room, Greenville police picked
her up and dropped her off at a restaurant, where an unknown Christian couple took her to a motel
and paid for her room, telling her they would call her the next morning. According to her testimony,
at that motel she was awakened by a man trying to have sex with her. She also testified that her
family was "all wrong" and that they had turned their backs on her. She stated that she wanted to
attend a clinic called La Hacienda that she had seen on the television show Dr. Phil and that she
could easily do the jobs of the people at the clinic better than they.

 We conclude the evidence is sufficient to support the trial court's finding that G. B. was likely
to cause serious harm to herself (Section 574.034(a)(2)(A)). The above evidence, if believed by the
trial court, could convince it that G. B. was not in touch with reality, that she had pieced together a
story as best she could, and that she had been under the influence of her mental illness to the extent 
she was likely to cause serious harm to herself by completely failing to connect with reality, thus
becoming a target for those who seek out the weak or injured. There is also evidence she had
recently threatened suicide, and the trial court was not bound to believe her current testimony in its
place.

 We also conclude the evidence is sufficient to support the trial court's findings that G. B. was
suffering severe and abnormal mental, emotional, or physical distress (Section 574.034(a)(2)(C)(i));
that she was experiencing a substantial mental or physical deterioration of her ability to function
independently (Section 574.034(a)(2)(C)(ii)); and that she was unable to make a rational and
informed decision as to whether to submit to treatment (Section 574.034(a)(2)(C)(iii)). The evidence
set out above, if believed, shows that G. B. is suffering severe mental and emotional distress that is
going to continue to get worse as time goes on if not treated. There was also evidence that she had
been hospitalized for mental health treatment every August and December for the past three years
for similar episodes, and her behavior and her attempts to explain that behavior both show a
deterioration of her mental and emotional abilities, and, with the final bizarre events that led up to
this proceeding, an inability to function independently. Dr. Penland also testified that G.B. has poor
insight into her illness and is not able to make sound judgments, as is also supported by the
recounting of her recent behavior and her lack of lucidity when questioned. 

 The evidence is both legally and factually sufficient to support the trial court's findings. We
overrule G. B.'s point of error and affirm the trial court's order.



 Josh R. Morriss, III

 Chief Justice


Date Submitted: November 8, 2006

Date Decided: December 5, 2006
1. In its order of commitment, the trial court found that G. B. "is likely to cause serious harm
to self, or will, if not treated continue to suffer severe abnormal mental, emotional or physical
distress." Additionally, the trial court found that G. B. 


 will, if not treated, continue to suffer severe abnormal mental, emotional or physical
distress, is experiencing substantial mental or physical deterioration of [her] ability
to function independently which is exhibited by the Proposed Patient's inability,
except for reasons of indigence, to provide for basic needs, including food, clothing,
health or safety; and is unable to make a rational and informed decision as to whether
or not to submit [to] treatment. 




is Court's opinion in Maysonet regarding the admissibility of radar
evidence. Lipscomb next asserts that because there were other cars nearby, of which Freeman also
checked the speed, it is possible Freeman's radar measured only the speed of these other cars and not
the speed of Lipscomb's car. Because there was sufficient evidence to provide Freeman probable
cause to believe Lipscomb was speeding, we reject these arguments.
            Freeman's testimony, if believed by the trial court—and we assume it was because the trial
court ruled against Lipscomb—would support a finding that Lipscomb was committing a crime by
speeding. Seventy miles per hour is the maximum lawful speed during daytime hours on Texas
interstate roadways. Tex. Transp. Code Ann. § 545.352(b) (Vernon Supp. 2004–2005). Traveling
in excess of that speed on a Texas interstate is unlawful. Tex. Transp. Code Ann. § 545.352(a)
(Vernon Supp. 2004–2005). Freeman, a certified peace officer and a fourteen-year veteran of the
sheriff's department, testified he first observed Lipscomb traveling at a speed Freeman believed to
be in excess of the posted speed limit. Freeman also testified that, based on his experience, he "can
get pretty close to telling that a vehicle is traveling faster than the normal flow of traffic." Freeman
subsequently verified his suspicions using "calibrated" radar.


 Based on his visual observations and
the confirmation he received from his radar unit, Freeman had specific information that would
logically lead him to conclude Lipscomb was unlawfully speeding. We believe Freeman's testimony
about using calibrated radar, testimony which the trial court could have properly interpreted to mean
the radar was operating correctly, when combined with the officer's earlier testimony that he had
visually estimated Lipscomb's speed to be excessive, was sufficient to satisfy the requirements we
set forth in Maysonet. And, to the extent that there may have been conflicting evidence about which
car Freeman's radar measured, the trial court resolved such factual conflicts against Lipscomb. 
Because, here, that conflict resolution is supported by the record, we will not disturb it.
            Accordingly, we cannot say the trial court erred by holding Freeman was authorized to stop
Lipscomb for speeding. The initial traffic stop was, therefore, lawful.
(2)       The Traffic Stop Was of Reasonable Length
            In his second and third points of error, Lipscomb contends Freeman unnecessarily prolonged
the traffic stop and searched Lipscomb's vehicle without valid consent. Officers are permitted to ask
for identification, a valid driver's license, and proof of insurance during a traffic stop. Davis v. State,
947 S.W.2d 240, 245 n.6 (Tex. Crim. App. 1997). Officers may also check for outstanding warrants. 
Id. The officer must, however, use "the least intrusive means reasonably available to verify or dispel
his suspicion in a short period of time." Id. Under Davis, Freeman's detention of Lipscomb "was
required to be temporary and could last no longer than was necessary" to satisfy or dispel the officer's
original suspicion of speeding and to conclude the stop. Id.
            In this case, a videotape of the traffic stop was entered into evidence. A review of that
videotape shows Freeman initiated the stop and made first contact with Lipscomb at 7:53 a.m. 
Freeman informed Lipscomb of the purpose of the stop, asked for Lipscomb's license and proof of
insurance, and briefly inquired into Lipscomb's driving and criminal histories. This initial
conversation lasted barely one minute. Freeman then returned to his patrol car, contacted a
dispatcher, and requested a criminal and out-of-state license history on Lipscomb. Eight to nine
minutes later, the dispatcher contacted Freeman with those histories, including verification that
Lipscomb had spent time in the penitentiary for narcotics trafficking. Freeman then returned to the
rear of Lipscomb's car and asked Lipscomb to step to the rear of that vehicle. Freeman then appears
to tell Lipscomb he will receive only a warning citation, and Freeman then asks for consent to search,
which Lipscomb provides. 
            Consent to search is "one of the well-established exceptions to the constitutional
requirements of both a warrant and probable cause." Carmouche v. State, 10 S.W.3d 323, 331 (Tex.
Crim. App. 2000) (citing Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973); State v. Ibarra, 953
S.W.2d 242, 243 (Tex. Crim. App. 1997)). The videotape clearly shows Lipscomb gave willing
consent to the officer's request to search the vehicle. Lipscomb's contention on appeal to the contrary
is disingenuous and not supported by the evidence. Less than ten seconds passed between the time
Freeman informed Lipscomb (at the rear of the car) that the latter would receive a warning citation
and the moment when Lipscomb consented to a search of the vehicle. Thus, we cannot conclude,
given the sequence of discrete facts of this case, that the lapse of ten seconds amounted to an
unreasonable extension of the duration of the traffic stop.


 We therefore overrule Lipscomb's second
and third points of error.
(3)       The Confession Was Admissible
            In his final point of error, Lipscomb contends his written custodial confession should have
been inadmissible because it was taken before he was taken to a magistrate to receive the warnings
required by Article 15.17 of the Texas Code of Criminal Procedure. See Tex. Code Crim. Proc.
Ann. art. 15.17 (Vernon 2005). "It is well settled that the failure to take an arrestee before a
magistrate in a timely manner will not invalidate a confession unless there is proof of a causal
connection between the delay and the confession." Renfro v. State, 958 S.W.2d 880, 887 (Tex.
App.—Texarkana 1997, pet. ref'd) (citing Cantu v. State, 842 S.W.2d 667, 680 (Tex. Crim. App.
1992)). "Additionally, when a person is properly warned of his rights by the person taking his
confession, the failure to take the accused before a magistrate before taking the confession does not
invalidate the confession." Id. (citing Self v. State, 709 S.W.2d 662, 667 (Tex. Crim. App. 1986)).
            Lipscomb has made no effort to point to any evidence in the record showing a causal
connection between the delay in being brought before a magistrate and his confession, nor has any
been shown by our review of the record. Moreover, the first paragraph of Lipscomb's confession
reads,
I, TERRENCE [sic] LAMONTE LIPSCOMB, do freely and voluntarily make the
following statement to Investigator MIKE CLAXTON and Ranger RONNY
GRIFFITH after having been warned by him on the 18th day of August 2003 at 9:30
AM at the Gregg County Sheriff's Office CID, that I have the right to remain silent
and not make any statement at all and that any statement I make may be used against
me at my trial; any statement I make may be used as evidence against me in court;
I have the right to have a lawyer present to advise me prior to and during any
questioning; [i]f I am unable to employ a lawyer, and I have the right to have a
lawyer appointed to advise me prior to and during questioning; and I have the right
to terminate the interview at any time. Knowing and intelligently understanding my
rights, I freely and voluntarily wish to waive the above rights and do hereby make
this statement . . . . 
 
The statement itself shows Lipscomb was warned of his rights before the statement was taken;
Article 15.17 therefore does not bar the statement's admissibility. We overrule Lipscomb's final
point of error.
            For the reasons stated, we affirm the trial court's judgment.


                                                                                    Josh R. Morriss, III
                                                                                    Chief Justice

Date Submitted:          July 12, 2005
Date Decided:             August 31, 2005

Do Not Publish