In re ESTATE OF Praxedis
CANALES, Deceased.

No. 04–91–00476–CV.

Court of Appeals of Texas,
San Antonio.

June 17, 1992.
Rehearing Denied Aug. 5, 1992.

David Diaz, Robert M. Zamora, Tom C. Wheat, Kathryn F. Green, Kleberg & Head, P.C., Wm. DeWitt Alsup, Alsup & Alsup, Corpus Christi, O.C. Hamilton, Jr., Atlas & Hall, McAllen, Hubert W. Green, Robert D. Reed, Green, McReynolds & Reed, San Antonio, for appellant.

Kim Cox, Cox & Robinson, Corpus Christi, J.G. Adami, Jr., Perkins, Oden, Warburton, McNeill, Adami & Paisley, Homer E. Dean, Jr., Tracy L. Spoor, Dean & Hunt, P.C., Alice, for appellee.

Before BUTTS, PEEPLES and BIERY, JJ.

PEEPLES, Justice.

Tomas Canales appeals from an order that (1) denied his motion for summary judgment to declare his father's trust arrangement invalid, (2) denied his motion to remove his brother Terry as executor of his father's estate, (3) granted Terry's motion for summary judgment declaring the trust valid, and (4) allowed the estate to be closed. At stake is whether the estate of Praxedis Canales passed in trust to Terry Canales as trustee for Praxedis' three adult children (Terry, Tomas, and Teresa), or whether the trust arrangement failed and their shares passed to them free and clear.

On February 22, 1982, Praxedis Canales executed two instruments: a trust agreement and a will. The trust agreement established two different kinds of revocable inter vivos trusts. The first trust provided that Praxedis would have income during his lifetime, and that upon his death the trust assets would pour into separate standby trusts for the benefit of his three children.[1] This second set of trusts consisted of the three standby trusts, which would receive the poured-over assets from the first trust and the assets from Praxedis' probate estate.

One issue in this appeal is whether both sets of trusts failed for lack of funding. In the trust agreement, Terry as trustee acknowledged the receipt of $1.00 in cash and the property listed on "Schedule A" as the trust property of the first trust. At the time of Praxedis' death, however, approximately two months after he signed the will and the trust agreement, "Schedule A" remained blank. The standby trusts were not funded, nominally or otherwise. Praxedis died in April 1982, and the will was probated in May.

In April 1988, Terry (the executor of the estate and the trustee of all the trusts) filed his petition for final accounting, distribution, closing of estate, declaration of rights, termination of trustee, and release and discharge of executor and trustee. Tomas and Teresa answered and filed counterclaims, and the case was transferred to the district court. In his original counterclaim, Tomas alleged usury and mismanagement of the estate by Terry. He later amended his counterclaim and challenged the validity of the entire trust arrangement. Tomas and Teresa filed separate motions for summary judgment. Terry also filed his motion for summary judgment, and the Unborn and Unascertained Beneficiaries of the Estate of Praxedis Canales were allowed to join in his motion. The court granted Terry's motion in part

---

1. The purpose of a standby trust is to receive funds later poured into the trust, to be adminis- tered according to the terms of the trust instru- ment.

and denied the motions filed by Tomas and Teresa. Teresa has not appealed.

The judgment upheld the validity of the will and both sets of trusts created in the trust agreement. The court also found that the beneficiaries had received benefits under the will and trust agreement, and had ratified and were estopped to deny the dispositive provisions of both instruments. Tomas appeals not only the granting of Terry's motion but also the denial of his own motion, which asked the court to declare the trust agreement invalid. *See Jones v. Strauss*, 745 S.W.2d 898, 900 (Tex. 1988); *Tobin v. Garcia*, 159 Tex. 58, 316 S.W.2d 396, 400–401 (1958). Prior to ruling on the summary judgment motions and after hearing several days of testimony, the court also denied Tomas' motion to remove Terry as the executor of the estate and allowed the estate to be closed. Tomas asserts in five points of error that the court erred in its rulings on the summary judgment motions, in refusing to remove Terry as executor, and in closing the estate. By cross-point Terry challenges an order directing him to make disbursements from a spendthrift trust directly to the beneficiary. We reverse the summary judgment declaring the will and trusts valid because Terry's motion did not request that relief; we affirm the remainder of the judgment.

## I. VALIDITY OF FIRST TRUST.

■ Tomas contends that his motion for summary judgment should have been granted because the first trust was never funded and therefore never existed under Texas law. Article IV of the will provides, "If the Trust Agreement is not in existence at the date of my death, I give all of the residue of my estate to those of my descendants who survive me per stirpes." Tomas argues that the trust agreement failed and the estate should be distributed per stirpes.

If the first trust was never funded, we do not see how Tomas was harmed. The first trust existed totally for Praxedis' benefit during his lifetime. It terminated when he died. If it was not funded, that has no effect on the validity of the standby trusts. If the first trust had no corpus, all of Praxedis' assets were in his probate estate, which he left to the three standby trusts.

Tomas seems to assume that if the first trust failed, the standby trusts failed also. But if the first trust and the standby trusts had been created in two different instruments, the invalidity of the first trust would have no bearing on the validity of the others. We see no reason why their creation in one instrument should make a difference.

■ In any event, the first trust was in fact funded. Nominal funding is a sufficient corpus; a nominally funded trust is considered legally in existence and ready to receive the real assets at the proper time in the future. *See* Ronald R. Cresswell, *Revocable Inter Vivos Trusts and Other Disability Planning Tools*, in STATE BAR OF TEXAS ADVANCED ESTATE PLANNING & PROBATE COURSE Q–3 (1990); Thomas M. Featherston, Jr., *Revocable Trust Planning v. Traditional Testamentary Planning*, in STATE BAR OF TEXAS ADVANCED ESTATE PLANNING & PROBATE COURSE J–32 (1991). Moreover, even though Schedule "A" was left blank, abundant property can nevertheless be identified from other provisions of the trust agreement. Section 1.6 provides in part:

> This trust shall terminate upon the death of the Grantor. Upon termination, the Trustee shall distribute *the assets of the trust* (which remain after the payments provided in section 1.5, or subject to obligations for taxes and expenses as provided in section 1.5) *as follows*, subject to the provisions of Article II: [2]

**2.** Article II of the Trust Agreement states in part:

> Any trust property that is distributable to one of the grantor's children pursuant to Section 1.6 shall not be distributed to such child outright, but instead shall continue to be held by the Trustee, IN TRUST, for his or her primary

benefit. Each trust created pursuant to this section shall be known by the name of the child of the grantor for whom it was created and such child is referred to in this Trust Agreement as the "Beneficiary" of his or her trust.

(a) The La Cabra Ranch (excluding the surface rights to the La Cabra Ranch Headquarters) and all of the cattle on the La Cabra Ranch....

(b) The surface rights to the La Cabra Ranch Headquarters....

(c) All real property located in Duvall County, Texas....

(d) That 232 acre tract of land (more or less), located in Cameron County, Texas, which is on the Rio Grande River and is known as MARIA TERESA.... (Emphasis added.)

The first trust did not fail for lack of funding.

## II. VALIDITY OF STANDBY TRUSTS.

Tomas challenges the validity of the standby trusts on two grounds: (a) because they did not exist before his father's death, the standby trusts could not receive assets from the estate because the trust agreement was not executed with the formalities required by the Probate Code; and (b) the standby trusts do not qualify as proper standby trusts under section 58a of the Probate Code because they were not funded.

The trust agreement provides: "This [first] trust shall terminate upon the death of the Grantor. Upon termination, the Trustee shall distribute the assets of the trust [after paying taxes and expenses] as follows, subject to the provisions of Article II: ..." The instrument then directs that certain assets be given to each child and channels the residue equally into the three standby trusts.

### A.

◼ Tomas first argues that standby trusts, which are set up to receive assets upon the settlor's death, must be executed with the same formalities as the probate code requires for wills. Citing the language from Article II quoted above, Tomas argues that the three standby trusts were testamentary because they did not come into existence until Praxedis' death. The supreme court stated in *Land v. Marshall*, 426 S.W.2d 841 (Tex.1968), "If the death of the trustor is a condition precedent to the creation of a trust, the requirements for the execution of a will must be met." *Id.* at 844. The typewritten Trust Agreement is not witnessed and therefore would not satisfy the probate code. *See* TEX.PROB. CODE § 59 (Vernon Supp.1991).

But the court in *Marshall* was referring to testamentary dispositions, not inter vivos trusts that are revocable during the settlor's lifetime, as its citation to the restatement of trusts makes clear. The restatement reporter's note, cited in *Marshall*, makes this distinction:

There is a difference between the situation where the death of the settlor is a condition precedent to the creation of a trust, and the situation where the trust is created during the lifetime of the settlor, although he reserves power to revoke it. In the former case no trust is created unless the requirements for the execution of a will are complied with. In the latter case the trust is not testamentary and may be created without compliance with the requirements for the execution of a will.

RESTATEMENT (2D) OF TRUSTS § 57 Reporter's Notes (1959). The standby trusts that Tomas attacks are inter vivos trusts, not testamentary dispositions; they were set up to receive property from a testamentary disposition. The trusts took effect on Praxedis' death only because at that time he lost the power to revoke them.

This reading of *Marshall* and the restatement is consistent with the Texas statutes. The Texas pour-over statute requires only a writing executed before or concurrently with the will; it says nothing about the formalities of § 59. *See* TEX.PROB.CODE § 58a (Vernon 1980). Nor does the trust code's statute of frauds require that signatures be witnessed. TEX.PROP.CODE § 112.-004 (Vernon 1984).

The standby trusts did not have to be executed with the formalities that apply to wills.

### B.

◼ Tomas next argues that the standby trusts fail because they were not funded—

and therefore were not in existence—before or concurrently with Praxedis' will. Ordinarily the notion of a trust connotes the existence of property, or a res. The trust code provides, "A trust cannot be created unless there is trust property." TEX.PROP.CODE § 112.005 (Vernon 1984). But § 58a of the probate code contains special rules for trusts that receive assets from a probate estate. Terry argues that § 58a does not require such a standby trust to be established or funded before the assets are poured in; it requires only that the trust *instrument* be written and in existence at the time the will is made. Section 58a provides:

> By a will duly executed pursuant to the provisions of this Code, a testator may devise or bequeath property to the trustee of any trust (including an unfunded life insurance trust, even though the trustor has reserved any or all rights of ownership in the insurance contracts) the terms of which are evidenced by a written instrument in existence before or concurrently with the execution of such will and which is identified in such will, even though such trust is subject to amendment, modification, revocation or termination. The property so devised or bequeathed shall be added to the corpus of such trust to be administered as a part thereof and shall thereafter be governed by the terms and provisions of the instrument establishing such trust, including written amendments or modifications thereto made before the death of the testator. An entire revocation of the trust prior to the testator's death shall cause the devise or bequest to lapse.

TEX.PROB.CODE ANN. § 58a (Vernon 1980).

While the statute is not as clear as it might be, we think it authorizes unfunded standby trusts if its other requirements are satisfied. Its purpose was to uphold standby trusts and make them easily available as estate planning devices. Certainly nothing in the statute says that standby trusts are not valid unless they are funded. Indeed, it says that a testator may pour assets into "any" trust (1) that is identified in the will and (2) whose terms were written before or concurrently with the execution of the will. It would be strange drafting to displace some but not all of the common-law obstacles to standby trusts without stating clearly which obstacles were to remain in place. We think that if the legislature had meant to require that this particular kind of trust be funded, it would have said so, and would have said whether nominal funding would suffice.

It is true that the statute is not without its ambiguities; two provisions of § 58a suggest that funding is required. First, the express approval of unfunded life insurance trusts might suggest that unfunded trusts not involving life insurance are not approved. But life insurance funding is a special case: insurance proceeds do not exist until the testator's death. For this reason it makes sense to single out life insurance funding. Second, the statement that poured-in funds shall be "added to" the corpus might suggest there must be a corpus at the outset. But that provision might also mean that the funds are added to whatever corpus exists, if any.

Before the legislature enacted § 58a, a trust could not be created without a res, or a fund. The purpose of the statute was to make standby trusts available as an estate planning tool, to receive assets from a pour-over will. Apparently Tomas perceives a difference between unfunded standby trusts and those that are nominally funded. We see little difference between a nominal corpus, which would satisfy Tomas' reading of § 58a, and no corpus. For practical purposes, a standby trust with no corpus and one with a corpus of one dollar, or ten dollars, are the same thing. Perhaps to require at least a nominal corpus would ensure that the settlor wanted to go through with the pour-over plan, but the other provisions of § 58a satisfy that goal. The statute ensures that the settlor is in earnest by requiring a written trust instrument in existence before or concurrently with the will, which is identified in the will. Here the will specifically referred to the trusts, which were created by Praxedis, and not a third party, and they were never revoked.

Section 58a is modeled after the Uniform Testamentary Additions to Trusts Act. The two statutes contain many similar provisions, but the Uniform Act expressly approved standby trusts "regardless of the existence, size, or character of the corpus of the trust." Section 58a does not contain that language. The Uniform Act has been revised since its enactment to resolve any lingering doubts that a standby trust does not have to be funded during the settlor's lifetime but can be funded by the assets poured in from the probate estate. UNIF.TESTAMENTARY ADDITIONS TO TRUSTS ACT § 2–511, 8A U.L.A. comment at 114 (Supp.1990).

Because the Texas drafters did not include the quoted language, Tomas asks us to infer they did not approve unfunded standby trusts. But the fact remains that they said nothing to disapprove unfunded standby trusts. Instead they wrote § 58a to apply to "any" trust whose *terms* are in writing and in existence, not to any trust already funded and in existence. Praxedis himself directed his executor to make distributions to the standby trusts whether they had "actually come into existence" or not.[3]

Commentators have concluded that § 58a does not require that standby trusts be funded during the testator's lifetime. Professor Alan Polasky notes that the Uniform Act and the Texas § 58a have the same purposes. Although the Texas statute is not as specific with regard to the existence of the trust, he says, its language—"to any trust (including an unfunded insurance trust ...), the terms of which are evidenced by a written instrument"—should be broad enough to sustain a standby trust, insurance or otherwise, even though only the written terms and not the corpus existed when the will was executed. Alan N. Polasky, *"Pour–Over Wills": Use with Inter Vivos Trusts*, 17 Sw.L.J. 410, 436–37 (1963).

The Texas statute, surely, is aimed at the accomplishment of the same goals as those sought by the Uniform Act, and it does not seem inappropriate to suggest that a Texas court might well construe the statute to reach those results more clearly specified by the Uniform Act. The omission in the Texas Act of the phrase 'regardless of the size of the corpus' does not seem significant.

*Id.* at 437. According to Polasky, the Uniform Act included the language about unfunded life insurance trusts only to satisfy those who were especially concerned that smallness or lack of corpus not invalidate a trust. *Id.*

This seems to be the common interpretation of § 58a among those who specialize in probate and trust law. "Whether the revocable trust is funded or unfunded, the settlor may provide in his or her will that the residuary estate passes to the trust.... The only substantive requirement is that the trust must be in existence or executed concurrently with the will. Tex.Prob.Code § 58a." Ronald R. Cresswell, *Revocable Inter Vivos Trusts and Other Disability Planning Tools*, in STATE BAR OF TEXAS ADVANCED ESTATE PLANNING & PROBATE COURSE Q–5 (1990).

For these reasons, we conclude that the unfunded standby trusts comply with § 58a and may receive the assets of the estate. Their terms were evidenced by a written instrument signed concurrently with the will, which identified the trusts. Additionally, Article V, Section 5.4 of the will clearly authorized the pour-over by allowing the executor to make distributions from the estate immediately upon Praxedis' death in accordance with the provisions of "any trust provided for by the Trust Agreement, whether or not any such trust has actually come into existence or received any distribution from my estate." Because Tomas did not show as a matter of law that the standby trusts were invalid, the trial court correctly denied his motion for summary judgment.

---

**3.** Section 5.4 of the will provides: "My Executor may make distributions from my estate immediately upon my death in accordance with the provisions of any trust provided for by the Trust Agreement, whether or not any such trust has actually come into existence or received any distribution from my estate."

Having denied Tomas' motion, the court then granted Terry's motion and declared the will and standby trusts valid. Tomas challenges that declaration on the ground that Terry did not ask for it in his own motion. Clearly, Tomas' failure to show as a matter of law that the trusts were invalid does not establish the converse—that they are valid as a matter of law. David Hittner & Lynne Liberato, *Summary Judgments in Texas*, 20 ST. MARY'S L.J. 243, 273–74 (1989). Similarly, the courts may not grant or affirm a summary judgment on a ground not specifically set out in the motion. *City of Houston v. Clear Creek Basin Auth.*, 589 S.W.2d 671, 677 (Tex.1979); *Birdwell v. Birdwell*, 819 S.W.2d 223, 229 (Tex.App.—Fort Worth 1991, writ denied); *Roberts v. Southwest Tex. Meth. Hosp.*, 811 S.W.2d 141, 145–46 (Tex.App.—San Antonio 1991, writ denied).

Terry's motion sought judgment on Tomas' counterclaim. It also sought judgment on his own claims on four grounds: estoppel, ratification, waiver, and limitations. The evidence raises a fact issue on the first three grounds, and they cannot support the judgment because Terry did not prove them as a matter of law. The court did not rest its declaration on the limitations ground, and therefore we cannot affirm on that basis. *Carlisle v. Philip Morris, Inc.*, 805 S.W.2d 498, 519 (Tex. App.—Austin 1991, writ pending); *see also Rogers v. Ricane Enterprises, Inc.*, 772 S.W.2d 76, 79 (Tex.1989) (if judgment does not specify grounds, appellate court will affirm on any valid ground urged); Hittner & Liberato, 20 ST. MARY'S L.J. at 282 (losing non-movant should ask court to specify ground for summary judgment if court granted motion on only one of several grounds). Terry's motion simply did not assert that the will and trust instruments were valid as a matter of law. We therefore must reverse that portion of the order before us and remand that issue for further proceedings.

## III. REMOVAL OF EXECUTOR.

Tomas next contends the court erred in denying his motion to remove Terry as independent executor. He cites three provisions of Probate Code § 149C, which authorize removal of an executor when:

(1) Sufficient grounds appear to support belief that he has misapplied or embezzled, or that he is about to misapply or embezzle, all or any part of the property committed to his care;

(2) He fails to make an accounting which is required by law to be made; [or]

(3) He is proved to have been guilty of gross misconduct or gross mismanagement in the performance of his duties.

Numerous allegations and explanations were aired during the seven-day bench trial of Tomas' motion to remove. Tomas claimed that the estate paid for virtually all of Terry's living expenses and the expenses of his private law practice, his private corporation, and his law partnership. He also asserted that Terry, his family, and his business occupied estate property without paying rent or reimbursement. A certified public accountant hired by Tomas examined the books and records of the estate and testified that Terry received approximately $1,200,000 in personal benefits without reimbursing the estate. These are serious allegations. As trustee Terry was a fiduciary as a matter of law, and he owed Tomas a high degree of loyalty and fair dealing. *See Humane Society v. Austin Nat'l Bank*, 531 S.W.2d 574, 577 (Tex. 1975); *cert. denied*, 425 U.S. 976, 96 S.Ct. 2177, 48 L.Ed.2d 800 (1976); *Slay v. Burnett Trust*, 143 Tex. 621, 187 S.W.2d 377, 387–88 (1945). Our question is whether the court abused its discretion in denying Tomas' motion to remove Terry as executor.

Terry testified that when he assumed the duties and responsibilities as executor he had to wind up his law practice because managing the estate required so much time. He worked hard to keep the costs of the estate down and, in fact, decided to prepare the estate tax return himself after he was told it would cost some $135,000 to have it prepared. Another cost-cutting measure was to move his family from McAllen to the La Cabra ranch because he needed to be there daily to monitor operations. Terry did not dispute that he made

improvements to the residence, but he disputed the assertion that the estate paid for the improvements and that he received $1,200,000 in personal benefits. Terry testified that he either paid for the improvements personally or the money was charged against his interest in the estate.

Terry also responded to accusations that the estate's bookkeeper, who was paid by the estate, worked for him personally and for his law firm. He testified the bookkeeper worked primarily on the estate books and any non-estate tasks she performed were only nominal. A complaint was also made that the estate paid bills it did not owe. Terry explained that often bills would be invoiced under the estate's name, his name individually, the name of his former law firm, or one of his corporations. If the bill was determined to be an estate debt, the estate paid for it regardless of the name listed on the invoice. He also explained that he used one of his corporations, Agon, to limit liability for the estate. As a result, Agon would receive money belonging to the estate but would immediately transfer it to the estate.

Tomas had the burden to establish a violation of § 149C. To prevail on appeal, he must demonstrate that he conclusively proved his case or that the court's failure to find for him on any of the grounds is so against the great weight and preponderance of the evidence to be manifestly unjust. *Estate of Minnick*, 653 S.W.2d 503, 508 (Tex.App.—Amarillo 1983, no writ). The court as the factfinder is the exclusive judge of the credibility of the witnesses and the weight to be given their testimony. *Aerospatiale Helicopter v. Universal Health Serv., Inc.*, 778 S.W.2d 492, 498 (Tex.App.—Dallas 1989, writ denied), *cert. denied*, —— U.S. ——, 111 S.Ct. 149, 112 L.Ed.2d 115 (1990); *Blackwood v. Tom Benson Chevrolet Co., Inc.*, 702 S.W.2d 732, 733 (Tex.App.—San Antonio 1986, no writ). After examining the record and the numerous allegations and explanations offered by each party, we hold that a fact issue was presented. Point of error four is overruled.

## IV. CLOSING OF THE ESTATE.

■ Finally, Tomas contends the court erred in failing to sustain his objections to the executor's affidavit to close the estate. Tomas claims that all the estate debts had not been paid, there were no distributions of estate property, and not all matters in controversy had been addressed prior to the closing of the estate.

The document filed by Terry was entitled "Affidavit Closing Estate." In accordance with probate code § 151(a), the affidavit listed the property and assets coming into the hands of the executor, the property remaining on hand after the debts had been paid, and the names and addresses of the devisees to whom the assets and property had been distributed. Tex.Prob.Code Ann. § 151(a) (Vernon 1980). The affidavit further stated that all debts had been paid and no debts remained owing. The affidavit was verified by Terry as required under the code. We hold that the "Affidavit Closing Estate" on its face met the requirements of § 151. *See Burke v. Satterfield*, 525 S.W.2d 950, 953 (Tex.1975); *In re Estate of Hanau*, 806 S.W.2d 900, 903 (Tex. App.—Corpus Christi 1991, writ denied). Like the courts in *Burke* and *Hanau*, we do not comment on the accuracy of the accounting or whether the estate has been properly administered. *See* 525 S.W.2d at 953; 806 S.W.2d at 904. The filing of the affidavit terminates the independent administration but does not "relieve the independent executor from liability for any mismanagement of the estate or from liability for any false statements contained in the affidavit." Tex.Prob.Code Ann. § 151(b) (Vernon Supp.1992). The trial court did not err in closing the estate. Point of error five is overruled.

## V. DISBURSEMENTS FROM SPENDTHRIFT TRUST.

By cross-point, Terry contends the court erred in ordering him to make royalty income disbursements from a spendthrift trust directly to Tomas, the trust beneficiary. But Terry did not complain about this action in the trial court and he may not complain for the first time on appeal. Tex.

R.App.P. 52(a); *Lemons v. EMW Mfg. Co.,* 747 S.W.2d 372, 373 (Tex.1988); *Pirtle v. Gregory,* 629 S.W.2d 919, 920 (Tex.1982). The cross-point is overruled.

We reverse the summary judgment declaring the will and trusts valid because the summary judgment proof did not refute estoppel, waiver, and ratification as a matter of law, because the court did not sustain Terry's limitations ground, and because Terry's motion urged no other grounds. That portion of the case is remanded for further proceedings. We affirm the remainder of the court's orders.