

# COURT OF APPEALS
**SECOND DISTRICT OF TEXAS**
**FORT WORTH**

**NO. 02-13-00099-CV**
**NO. 02-13-00100-CV**

IN THE MATTER OF P.E.J.

----------

FROM COUNTY COURT AT LAW NO. 1 OF WICHITA COUNTY

----------

# MEMORANDUM OPINION[1]

----------

## I. INTRODUCTION

We are asked to determine whether clear and convincing evidence supports appellant P.E.J.'s court-ordered commitment to North Texas State Hospital and her court-ordered treatment with psychoactive medications. We will affirm.

## II. BACKGROUND

On March 11, 2013, the trial court, having found that P.E.J. was mentally ill and unable to make a rational and informed decision about whether to submit to

---

[1]*See* Tex. R. App. P. 47.4.

treatment, ordered that she be committed to the hospital for in-patient care for a period not to exceed ninety days. By separate order, the trial court also authorized treatment with psychoactive medication during P.E.J.'s temporary hospitalization. P.E.J. appeals from both orders, challenging the legal and factual sufficiency of the evidence to support the trial court's findings that protective custody and psychoactive medications are necessary.

## III. JURISDICTION

As a threshold matter, we note that the ninety-day period for which P.E.J. was ordered to receive services has expired. Nevertheless, we have jurisdiction. The expiration of the time for which she was ordered to receive services does not require the appeal to be dismissed for mootness. *See State v. K.E.W.*, 315 S.W.3d 16, 20 (Tex. 2010) (*citing State v. Lodge*, 608 S.W.2d 910, 912 (Tex. 1980)).

## IV. TEMPORARY MENTAL HEALTH COMMITMENT

In her issue regarding her temporary commitment, P.E.J. argues that the evidence is legally and factually insufficient to support the trial court's finding that she is experiencing a deterioration of her ability to function independently due to her mental illness. We disagree.

### A.    Statutory Requirements

A court may order a proposed patient to receive temporary inpatient mental health services only if the factfinder concludes from clear and convincing

evidence that the proposed patient is mentally ill and also meets at least one of the additional criteria set forth in Section 574.034(a)(2):

> (2) as a result of that mental illness the proposed patient:
>
> > (A) is likely to cause serious harm to himself;
> >
> > (B) is likely to cause serious harm to others; or
> >
> > (C) is:
> >
> > > (i) suffering severe and abnormal mental, emotional, or physical distress;
> > >
> > > (ii) experiencing substantial mental or physical deterioration of the proposed patient's ability to function independently, which is exhibited by the proposed patient's inability, except for reasons of indigence, to provide for the proposed patient's basic needs, including food, clothing, health, or safety; and
> > >
> > > (iii) unable to make a rational and informed decision as to whether or not to submit to treatment.

Tex. Health & Safety Code Ann. § 574.034 (West 2010). Here, the trial court's written order affirmatively found the State's allegations under (C) to be true.

## B. The State's Burden

The evidentiary standards for involuntary commitment are high. *Harris v. State*, 615 S.W.2d 330, 333 (Tex. Civ. App.—Fort Worth 1981, writ ref'd n.r.e.). The State has the burden of establishing by clear and convincing evidence that the proposed patient meets at least one of the additional criteria listed in Section 574.034(a)(2). *Mezick v. State*, 920 S.W.2d 427, 430 (Tex. App.—Houston [1st Dist.] 1996, no writ). Clear and convincing evidence is that "degree of proof which will produce in the mind of the trier of fact a firm belief or conviction as to

3

the truth of the allegations sought to be established." *State v. Addington*, 588 S.W.2d 569, 570 (Tex. 1979).

As a general rule, when court-ordered temporary mental health services are sought under subsection (a), specific requirements for clear and convincing evidence are imposed: the evidence must include expert testimony and, unless waived, evidence of a recent overt act or a continuing pattern of behavior that tends to confirm: (1) the likelihood of serious harm to the proposed patient or others; or (2) the proposed patient's distress and the deterioration of the proposed patient's ability to function. Tex. Health & Safety Code Ann. § 574.034(d). An expert diagnosis, without more, is not sufficient to confine a patient for compulsory treatment. *Mezick*, 920 S.W.2d at 430. The State cannot meet its burden of proof without presenting evidence of the behavior of the proposed patient that provides the factual basis for the expert opinion. *See id.* The recent overt act or continuing pattern of behavior shown by the State must also relate to the criterion on which the judgment is based. *See T.G. v. State*, 7 S.W.3d 248, 252 (Tex. App.—Dallas 1999, no pet.).

## C.    Standards of Review

To review the legal sufficiency of the evidence where the burden of proof is clear and convincing evidence, we consider all of the evidence in the light most favorable to the finding to determine whether a reasonable factfinder could have formed a firm belief or conviction that its findings were true. *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). We must assume that the factfinder resolved

4

disputed facts in favor of its finding if a reasonable factfinder could do so, and must disregard all evidence that a reasonable factfinder could have disbelieved or found to be incredible. *Id.*

In reviewing factual sufficiency challenges, we review all the evidence in the record, both that in support of and contrary to the trial court's findings. *In re C.H.*, 89 S.W.3d 17, 27–29 (Tex. 2002). We must give due consideration to evidence the factfinder could reasonably have found to be clear and convincing. *Id.* at 25. Under the clear and convincing standard, we determine whether the evidence is such that the factfinder could reasonably form "a firm belief or conviction" as to the truth of the allegations sought to be established by the State. *Id.* We must consider whether disputed evidence is such that a reasonable factfinder could not have reconciled that disputed evidence in favor of its finding. *J.F.C.*, 96 S.W.3d at 266. The trial court as the factfinder is the exclusive judge of the credibility of the witnesses and the weight to be given their testimony. *In re Estate of Canales*, 837 S.W.2d 662, 669 (Tex. App.—San Antonio 1992, no writ).

### D.    Sufficiency of the Evidence

P.E.J. does not challenge the trial court's finding that she is mentally ill. *See* Tex. Health & Safety Code Ann. § 574.034(a)(1). Furthermore, P.E.J. states that she is focusing her appeal on "prong (ii)" of Section 574.034(a)(2)(C), and she does not offer an analysis to challenge either subsection (i) or (iii) of Section

5

574.034(a)(2)(C).[2]  *See* Tex. Health & Safety Code Ann. § 574.034(a)(2)(C). Thus, we interpret her argument to be limited to subsection (ii); that is, whether there is sufficient evidence to support the trial court's finding that P.E.J. is experiencing substantial mental or physical deterioration of her ability to function independently, which is exhibited by her inability to provide for her basic needs, including "health, or safety." *Id.* And although P.E.J. also does not challenge the trial court's finding that a recent overt act or a continuing pattern of behavior occurred which tends to show her distress or deterioration of ability to function independently, we will address the evidence relating to that finding because it also supports the trial court's finding that P.E.J. is experiencing substantial mental or physical deterioration of her ability to function independently. *See id.*; *see also* Tex. Health & Safety Code Ann. § 574.034(d) (requiring state to prove by clear and convincing evidence, including expert testimony, evidence of a recent overt act or a continuing pattern of behavior "unless waived"); *see also* *State ex rel. E.D.*, 347 S.W.3d 388, 392–93 (Tex. App.—Dallas 2011, no pet.) (discussing the interplay between evidence of a proposed patient's recent overt act and evidence of the patient's deterioration of ability to function independently).

---

[2]In her brief, P.E.J. states that she "will focus on prong (ii)" of Section 574.034(a)(2)(C). Even though at times she states subsection "(iii)" in her analysis, the language that she uses is addressing subsection (ii), and we conclude that her references to subsection (iii) are typographical errors. *See* Tex. Health & Safety Code Ann. § 574.034(a)(2)(C).

Regarding her recent overt act, Dr. Jack Randolph Tomlinson, M.D., the State's expert witness and P.E.J.'s treating psychiatrist at the hospital, testified that P.E.J. "apparently was in Palo Pinto County" and had stopped at a convenience store alleging that "somebody had stolen a car in a car lot and that she knew it." Tomlinson's only other testimony regarding the recent overt act[3] is that P.E.J. believed that she was diverted to Palo Pinto County because "she tried to go through Dallas and all the highways were blocked by FEMA." Tomlinson stated, "From there, it got worse." But the rest of his testimony involves his observations regarding P.E.J. at the hospital and her "symptoms of . . . mental illness" that she exhibited after authorities brought her there. According to Tomlinson, P.E.J. suffers from "psychotic disorder not otherwise specified."

Regarding P.E.J.'s substantial mental deterioration, Tomlinson testified that while in his care, P.E.J. has talked about the CIA and a sniper who came in contact with her, her ex-husband[4] being the devil, and how she "feels like it's her duty to help all the fallen angel children." *See K.E.W.*, 315 S.W.3d at 21–22 ("[A]

---

[3]The trial court's file contains numerous documents detailing the events that led to these commitment proceedings. Even though the trial court took judicial notice of the contents of its own file, it could not take judicial notice of the truth of any allegations contained in the file. *See State ex rel. K.H.*, No. 02-02-00301-CV, 2003 WL 21404821, at *2 (Tex. App.—Fort Worth June 19, 2003, no pet.) (mem. op.). Therefore, we may consider only the evidence presented at the hearing in our review. *See id.*

[4]Tomlinson testified that P.E.J. made a statement that her "ex-husband" was the devil. When she testified, P.E.J. referred to this person as her "boyfriend."

7

proposed patient's words are overt acts within the meaning of Section 574.034(d)."). Tomlinson described P.E.J. as "illogical [and] disorganized with some flight of ideas and some paranoid delusions." He averred that she refuses to take medications and that because of this refusal, if she returns to public life, "she'll wind up in jail or wind up [being committed to a hospital]" and that "she may do the same thing again"—reliving her actions in Palo Pinto County that led to these commitment proceedings.

According to Tomlinson, P.E.J. is unable to understand the nature and consequences of her mental illness and the need for treatment. Tomlinson said, "She doesn't think that there's anything wrong with her and that she's okay, nothing wrong at all." In explaining why he believed that P.E.J. was experiencing severe and abnormal mental distress, Tomlinson said that recently P.E.J. told him that when she'd look outside, she would "see all this negative energy out there, these like pipe things were all over it." He said, "I called it dust, but she calls it negative energy." Tomlinson explained further that P.E.J. "talks about [the hospital staff] being full of negative energy" and that P.E.J. had called the FBI, the CIA, and the Texas Attorney General from the hospital.[5]

Tomlinson said that he believed that P.E.J. would not normally exhibit these types of behavior except for her mental illness. When asked whether he believed that P.E.J. was experiencing mental or physical deterioration of her

---

[5]As Tomlinson testified, P.E.J. repeatedly interjected statements to the court, including at one time stating that she had called the "FBI and the Secret Service, because I am protected by the Secret Service and that's not a lie."

8

ability to function independently and care for herself because of her illness, Tomlinson responded, "I would think so." When asked why he believed that she has deteriorated, Tomlinson answered, "She's too intent upon her own condition and getting out rather than doing something with herself." He said that her illness also prevented her from performing her vocation as a nurse. And although Tomlinson did say that P.E.J. "probably" could take care of her "basic needs," he said that she is unable to address her mental illness and he agreed that it appears that P.E.J. possesses a complete lack of insight into it.

The majority of evidence regarding P.E.J.'s recent overt act and her mental deterioration comes from her own testimony. P.E.J. stated that she had been brought to the hospital "after [her] life was threatened by the Palo Pinto Sheriff's Department by the Mafia Dom [S]heriff Ira Mercer." She claimed that the police "almost murdered" her because Mercer "got wind that [she] was in town." She testified that she went to a convenience store to tell the clerk that the "cars around there" were "stolen," and that "it looked like there's probably some Satanists that live" in that area. She averred that three days prior to this incident, she was "on the Internet . . . looking for truthing sheriffs because [she does] work for Yahweh Jesus Christ [who currently lives in] Australia." P.E.J. said that she discovered on the "computer" that "there was a sheriff's department in Texas that was Satanic, and that was the Palo Pinto County Sheriff's Department."

P.E.J. denied that she needs medication; rather, according to P.E.J., "all" she needs is "some counseling with [her boyfriend] and his family in Corpus

9

Christi." While explaining her ability to secure work if she were released, P.E.J. stated that she was an adult and pediatric nurse, and that she has previously "worked acute care in ICU, ER, [and] psychiatric nursing." She also added that she had "read up on Brian Weiss, a psychiatrist [who is] world renown, about his recollection of people being reincarnated and proof of that." She also averred that she had studied "other psychiatrists'" work. According to P.E.J., she is "protected by the Secret Service out of Birmingham, Alabama." P.E.J. explained that she had not said that her "boyfriend was the devil." Rather, she said that she told Tomlinson that "negative energy is demonic spirits that can influence or possess people." P.E.J. averred that Tomlinson was "lying about" her being mentally ill and that she does "not see imaginary things."

P.E.J.'s testimony concluded when she became nonresponsive to questions and instead began to explain that when she was in Palo Pinto County, "[the police] tried to get me onto a road. They got me up there and tried to shove me off a cliff into the reservoir. I had to turn around and do defensive driving." She continued over objections by both attorneys and instruction by the trial court, claiming to have detailed the events in Palo Pinto County and sent them "to the FBI and Secret Service." After further objections by counsel and more instructions by the trial court that she needed to respond to questions only, P.E.J. volunteered that she desired to "go back" to her boyfriend "and resolve our issues and have couple therapy." And then, after another lengthy diatribe about how she ended up in Palo Pinto County, her own attorney attempted to redirect

10

her focus by asking, "If []Tomlinson asked you to take the medication, would you take it?" The following colloquy took place:

> [P.E.J.]: I need to go through outpatient therapy in Corpus Christi. As far as going through counseling - -
>
> THE COURT: That's not his question.
>
> [P.E.J.]: No, I would not, because I don't need medication. I'm not psychotic. I'm not depressed. Have talked to Nicole throughout this process. She knows I'm not depressed. She knows I'm not psychotic.
>
> [P.E.J.'s attorney]: Okay. Your Honor we rest and close.
>
> [State's attorney]: Rest and close.
>
> [P.E.J.]: I have a dog that they took and he's in - - can I explain where the dog is? He's in Mineral Wells. I need to pick my dog up. I put detailed - - I did let the Secret Service know and the FBI know what happened here as far as me being held against my free will.
>
> THE COURT: Ma'am, they've closed on presenting evidence.

P.E.J. then stated, "The sheriff tried to murder me that day."

P.E.J. claims that this evidence does not support the trial court's finding that she is experiencing a deterioration in her ability to function independently because Tomlinson stated that he thought that P.E.J. could take care of her basic needs, that Tomlinson's testimony regarding P.E.J.'s ability to function vocationally is irrelevant, and that Tomlinson's statement that P.E.J. is "too intent upon her own condition and getting out rather than doing something with herself" is "somewhat odd" and not evidence that P.E.J. is experiencing an inability to function independently and care for herself. While we agree that in a vacuum, Tomlinson's statement that P.E.J. is "too intent upon her own condition and

11

getting out rather than doing something with herself" is a "somewhat odd[ly]" worded statement; in context, the statement is an expression that P.E.J. rejects that she is mentally ill, she rejects the need for medication and treatment at the hospital, and she is "intent" on pursuing her boyfriend to Corpus Christi, rather than receive treatment for her mental illness. In her own testimony, P.E.J. repeatedly insisted that she be allowed to go to Corpus Christi to be near her boyfriend, and she repeatedly stated that she was not mentally ill and did not need medication. We conclude that Tomlinson's statement is evidence of P.E.J.'s deterioration in her ability to function independently.

Furthermore, Tomlinson's statement that he thought P.E.J. would be able to take care of her basic needs is not evidence contrary to the trial court's finding that P.E.J. is experiencing substantial mental deterioration of her ability to function independently. The enumerated list in the statute is illustrative and not an exhaustive set of factors that must be met. *See Armstrong v. State*, 190 S.W.3d 246, 254 (Tex. App.—Houston [1st Dist.] 2006, no pet.) ("[W]e agree . . . that subsection [iii's] list of basic needs including 'food, clothing, health, or safety' is illustrative and not exhaustive."). And it is clear from his testimony that Tomlinson did not include P.E.J.'s ability to care for her health and safety in that statement. Additionally, courts have held that evidence of a proposed patient's inability to secure employment is relevant to the inquiry of the ability to function independently by providing for basic needs. *See State ex rel. M.R.*, No. 12-03-00004-CV, 2003 WL 22047792, at *2, *5 (Tex. App.—Tyler Aug. 29, 2003, no

pet.) (mem. op.) (reasoning that expert doctor's testimony that proposed patient's mental illness would inhibit him from obtaining and keeping a job some evidence of the inability to function independently).

Considering all the evidence in the light most favorable to the trial court's finding, we hold that a reasonable factfinder could have formed a firm belief or conviction that P.E.J. was experiencing a deterioration of her ability to function independently, which is exhibited by her inability to provide for her basic needs. *See J.F.C.*, 96 S.W.3d at 266. Furthermore, we hold that there is not a level of disputed evidence such that a reasonable factfinder could not have reconciled that disputed evidence in favor of finding that P.E.J. is experiencing substantial mental or physical deterioration of her ability to function independently to provide for her basic needs. *See C.H.,* 89 S.W.3d at 27–29. We overrule P.E.J.'s issue regarding her temporary mental health commitment.

## V. ORDER AUTHORIZING PSYCHOACTIVE MEDICATIONS

In her issue pertaining to the trial court's order authorizing the administration of psychoactive medications regardless of her refusal, P.E.J. argues that the evidence is legally and factually insufficient to support the trial court's findings that she lacked the capacity to make a decision regarding the administration of these medications and that it was in her best interest.

### A. Health and Safety Code Section 574.106(a–1)

The trial court may issue an order authorizing psychoactive medications only if it finds that one of the two grounds in section 574.106(a–1) has been

13

established by clear and convincing evidence after a hearing. Tex. Health & Safety Code Ann. § 574.106(a–1). Pertinent to this case, the first ground that supports such an order has two parts: (1) the patient lacks the capacity to make a decision regarding the administration of the proposed medication and (2) treatment with the proposed medication is in the patient's best interest. *Id.* § 574.106(a–1)(1).

## B.    Capacity

"Capacity" under section 574.106(a–1)(1) means a patient's ability to understand the nature and consequences of the proposed treatment, including the benefits, risks, and alternatives to the proposed treatment, and to make a decision whether to undergo the proposed treatment. *Id.* § 574.101(1) (West 2010), § 574.106(a–1)(1); *State ex rel. E.G.*, 249 S.W.3d 728, 731 (Tex. App.— Tyler 2008, no pet.).

Given the evidence presented at the hearing, which is detailed above, and viewing that evidence in the light most favorable to the trial court's capacity finding, while also giving deference to the trial court's determination of the witnesses' credibility and demeanor, we conclude and hold that the trial court could have formed a firm belief or conclusion that P.E.J. lacked the capacity to make a decision regarding the administration of psychoactive medications to treat her mental illness. *See D.P. v. State*, Nos. 01–09–00097–CV, 01–10–00002–CV, 2010 WL 376007, at *8 (Tex. App.—Houston [1st Dist.] Feb. 4, 2010, no pet.) (mem. op.) (holding evidence legally sufficient to support capacity finding

14

when physician testified that appellant lacked capacity because he was delusional and did not think he was sick). Further, because P.E.J. testified that she is not mentally ill; averred that she does not need medication; demonstrated an inability to directly answer questions at the hearing and instead giving long, fanciful narratives; and presented no evidence disputing that she lacked the capacity to make a decision regarding the proposed treatment, we hold that there is not disputed evidence in this case such that a reasonable factfinder could not have reconciled that disputed evidence in favor of the trial court's capacity finding. *See State ex rel. T.M.*, No. 12-05-00389, 2006 WL 1419416, at *4 (Tex. App.—Tyler May 24, 2006, no pet.) (mem. op.) (holding evidence factually sufficient to support trial court's finding that proposed patient lacked capacity to make decision regarding medications when proposed patient denied the need for medication, did not believe he was mentally ill, and followed his answers on stand with a "narrative about 'casting lots' and being Elijah the prophet"); *see also M.H. v. State ex rel. M.H.*, No. 01-09-00205-CV, 2009 WL 2050988, at *4 (Tex. App.—Houston [1st Dist.] July 16, 2009, no pet.) (mem. op) ("Because M.H. presented no evidence disputing that she had lacked the capacity to make a decision regarding the proposed treatment, we conclude that the evidence was also factually sufficient to allow a fact finder to form a firm belief or conviction that appellant lacked capacity to make a decision."). We overrule this portion of P.E.J.'s issue.

15

## C.    Best Interest Finding

P.E.J. also challenges the legal and factual sufficiency of the evidence to support the trial court's best interest finding.  In making its best interest findings under either ground of section 574.106(a–1), the trial court shall consider (1) the patient's expressed preferences regarding treatment with psychoactive medication; (2) the patient's religious beliefs; (3) the risks and benefits, from the patient's perspective, of taking psychoactive medication; (4) the consequences to the patient if the psychoactive medication is not administered; (5) the patient's prognosis if she is treated with psychoactive medication; (6) alternative, less intrusive treatments that are likely to produce the same results as treatment with psychoactive medication; and (7) less intrusive treatments likely to secure the patient's agreement to take the psychoactive medication.  Tex. Health & Safety Code Ann. § 574.106(b).

As detailed above, Tomlinson testified that P.E.J. refuses to take medication.  He also stated that P.E.J. does not have the capacity to make a decision regarding the administration of the medications because she does not accept or understand the nature of her mental illness.  Further, Tomlinson stated that there are no alternatives to the administration of medications.  Tomlinson testified as to both the benefits and side effects of the proposed medications, and he averred that the benefits of the medications outweighed the side effects.  In his opinion, the administration of these medications is in the best interest of P.E.J., and his prognosis for P.E.J. if she takes the medications is that in six to

eight weeks her condition would improve. Tomlinson testified that without the medications, P.E.J.'s condition would deteriorate further.

P.E.J. did not testify specifically to any of the factors listed above. She did say that she did not need medications, but she did not offer any insight into her position. And although she did discuss that she "works" for "Yahweh Jesus Christ [who currently lives in] Australia," P.E.J. did not testify that she was adverse to taking medications because of her religious beliefs.

Based on the entire record, we hold that the trial court could have reasonably formed a firm belief or conviction that the administration of the proposed medications and treatment was in P.E.J.'s best interest. *See J.F.C.*, 96 S.W.3d at 266. Finally, we hold that there is not disputed evidence in this case such that the trial court could not have reconciled that disputed evidence in favor of its finding that the administration of the proposed medications and treatment was in P.E.J.'s best interest. *See A.S. v. State*, 286 S.W.3d 69, 73 (Tex. App.—Dallas 2009, no pet.) (holding evidence that mental health patient diagnosed with schizophrenia would not take medication without a court order, that there were no alternatives to the administration of the medications, and that patient did not have the capacity to make a decision regarding the administration of medications because she did not understand the nature of her illness or the necessity of the medications was factually sufficient to support a finding that proposed medications were in patient's best interest). Thus, we overrule the remainder of

17

P.E.J.'s issue regarding court-ordered administration of psychoactive medications.

## VI. CONCLUSION

Having overruled P.E.J.'s issues on appeal, we affirm the trial court's judgments.

PER CURIAM

PANEL:  MEIER, GARDNER, and GABRIEL, JJ.

DELIVERED:  August 15, 2013