

# COURT OF APPEALS
### SECOND DISTRICT OF TEXAS
### FORT WORTH

## NO. 02-13-00263-CV

IN THE MATTER OF P.O.C.

-----------

FROM THE PROBATE COURT OF DENTON COUNTY

----------

## MEMORANDUM OPINION[1]

----------

### I. INTRODUCTION

Appellant P.O.C. appeals from a judgment for temporary court-ordered inpatient mental-health services. In a single issue, P.O.C. challenges the factual sufficiency of the evidence to support the jury's findings. We will affirm.

### II. BACKGROUND

On July 18, 2013, a jury found by clear and convincing evidence that P.O.C. is mentally ill; that as a result of his mental illness, P.O.C. is likely to

---

[1]*See* Tex. R. App. P. 47.4.

cause serious harm to himself; that as a result of his mental illness, P.O.C. is suffering severe and abnormal mental, emotional, or physical distress; that as a result of his mental illness, P.O.C. is experiencing substantial mental or physical deterioration of his ability to function independently, which is exhibited by his inability, except for reasons of indigence, to provide for his basic needs including food, clothing, health, or safety; and that as a result of his mental illness, P.O.C. is unable to make a rational and informed decision as to whether or not to submit to treatment. On the same day, the trial court ordered that P.O.C. be committed for mental-health services at the North Texas State Hospital Wichita Falls Campus (NTSH) for a period of time not to exceed ninety days. This appeal followed.[2]

### III. TEMPORARY MENTAL-HEALTH COMMITMENT JUDGMENT

In his sole issue, P.O.C. argues that the evidence is factually insufficient to support the trial court's findings that protective custody is necessary. Specifically, P.O.C. argues that his testimony demonstrates he is competent and his behavior is justified based on his cultural influences from his upbringing in India.

---

[2]By separate order after hearing testimony on a later date, the trial court also authorized treatment of P.O.C. with psychoactive medication during his temporary hospitalization.

## A. Statutory Requirements

A trial court may order a proposed patient to receive temporary inpatient mental-health services only if the factfinder concludes from clear and convincing evidence that the proposed patient is mentally ill and also satisfies at least one of the subparagraphs under Texas Health and Safety Code section 574.034(a)(2):

> (2)　　as a result of that mental illness the proposed patient:
>
> > (A)　　is likely to cause serious harm to himself;
> >
> > (B)　　is likely to cause serious harm to others; or
> >
> > (C)　　is:
> >
> > > (i)　　suffering severe and abnormal mental, emotional, or physical distress;
> > >
> > > (ii)　　experiencing substantial mental or physical deterioration of the proposed patient's ability to function independently, which is exhibited by the proposed patient's inability, except for reasons of indigence, to provide for the proposed patient's basic needs, including food, clothing, health, or safety; and
> > >
> > > (iii)　　unable to make a rational and informed decision as to whether or not to submit to treatment.

Tex. Health & Safety Code Ann. § 574.034(a)(1)–(2) (West 2010). Here, in addition to finding that P.O.C. is mentally ill, the trial court's written order states that the jury affirmatively found the State's allegations under (A) and (C) to be true.

3

### B. The State's Burden

The evidentiary standards for involuntary commitment are high. *State ex rel. E.E.*, 224 S.W.3d 791, 794 (Tex. App.—Texarkana 2007, no pet.) (citing *Harris v. State*, 615 S.W.2d 330, 333 (Tex. Civ. App.—Fort Worth 1981, writ ref'd n.r.e.)). The State has the burden of establishing by clear and convincing evidence that the proposed patient meets at least one of the subparagraphs listed under section 574.034(a)(2). *See Mezick v. State*, 920 S.W.2d 427, 430 (Tex. App.—Houston [1st Dist.] 1996, no writ). Clear and convincing evidence is "that measure or degree of proof which will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *State v. K.E.W.*, 315 S.W.3d 16, 20 (Tex. 2010). When court-ordered temporary mental-health services are sought under section 574.034(a), specific requirements for clear and convincing evidence are imposed: the evidence must include expert testimony, and unless waived, evidence of a recent overt act or a continuing pattern of behavior that tends to confirm "(1) the likelihood of serious harm to the proposed patient or others; or (2) the proposed patient's distress and the deterioration of the proposed patient's ability to function." Tex. Health & Safety Code Ann. § 574.034(d).

An expert's diagnosis, without more, is not sufficient to confine a patient for compulsory treatment. *See E.E.*, 224 S.W.3d at 794 (citing *Mezick*, 920 S.W.2d at 430). The State cannot meet its burden of proof without presenting evidence of the behavior of the proposed patient that provides the factual basis for the

4

expert opinion. *See id.* The recent overt act or continuing pattern of behavior shown by the State must also relate to the criterion on which the judgment is based. *See T.G. v. State*, 7 S.W.3d 248, 252 (Tex. App.—Dallas 1999, no pet.).

## C. Standard of Review

Because the State has a heightened burden of proof in commitment cases, this court applies a heightened standard of review. *State ex rel. F.S.*, No. 05-13-00413-CV, 2013 WL 3488023, at *1 (Tex. App.—Dallas July 10, 2013, no pet.) (citing *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002)). In reviewing factual sufficiency challenges, we review all the evidence in the record, both supporting and opposing the trial court's findings. *C.H.*, 89 S.W.3d at 27–29. We must give due consideration to evidence the trier of fact could reasonably have found to be clear and convincing. *Id.* at 25. Under the clear and convincing standard, we determine whether the evidence is such that the factfinder could reasonably form "a firm belief or conviction" as to the truth of the allegations sought to be established by the State. *Id.* We must consider whether disputed evidence is such that a reasonable factfinder could not have reconciled that disputed evidence in favor of its finding. *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). The trial court as the factfinder is the exclusive judge of the credibility of the witnesses and the weight to be given their testimony. *In re Estate of Canales*, 837 S.W.2d 662, 669 (Tex. App.—San Antonio 1992, no writ).

## D. Sufficiency of the Evidence

Because P.O.C. does not challenge any specific individual jury finding related to the temporary mental-health commitment judgment, we set forth a summary of the testimony and exhibits presented at trial.

### 1. Dr. Shupe's Testimony

Dr. James Shupe testified that he had examined P.O.C. twice in ten days, including the day of the trial; that there was no difference between the first meeting and the second meeting as far as the underlying facts; and that he had reviewed the medical records of psychiatrist Neil Jacobsen, a certificate of medical examination by psychiatrist Diana Isachievici, the physicians' progress notes from NTSH, and the nursing observations on P.O.C. from the hospital. Dr. Shupe, Dr. Jacobsen, and psychiatrist Isachievici diagnosed P.O.C. with schizophrenia.

P.O.C. had exhibited symptoms of schizophrenia for approximately five or six years. Dr. Shupe agreed that P.O.C. had previously been to Terrell State Hospital as an inpatient and that there have been cycles when P.O.C. has had to be hospitalized to be medicated in order to regain his ability to function and live in a community. Dr. Shupe said that in the past, P.O.C. has been successfully treated and has functioned well for extended periods of time when he takes his medications. But because P.O.C. had not been on medication for three or four months, he had gone from functioning well at home, even helping his father and

6

sisters with different activities, to not functioning at all and not taking care of himself.

P.O.C. had not shown aggression toward others, but in the months before the trial, he had harmed himself by hitting his head on objects, by picking up objects and hitting his head with them, and by refusing to eat or drink for days or weeks at a time. Dr. Shupe testified that P.O.C.'s body mass index is at seventeen, which is more than twenty percent below where it should be; he is at the point where his body will start eating away his muscles and other organs to get nutrition in order to survive. Dr. Shupe testified that P.O.C. had to be transported to the hospital to be given intravenous fluids because of his refusal to eat or drink.[3]

While in NTSH, P.O.C. had refused to take medication. P.O.C. had engaged in conversation, but Dr. Shupe noted that P.O.C.'s conversations became unproductive when the topics of medication and treatment were discussed. P.O.C. used real words and communicated in sentences, but his sentences did not relate to the questions that he had been asked.

Dr. Shupe opined that P.O.C. was severely and persistently mentally ill at the time of trial. Dr. Shupe further opined that, if left untreated, P.O.C.'s psychosis will continue to worsen, and he will not perform the activities of daily

---

[3]On July 14, 2013, P.O.C. was taken from NTSH to the United Regional Health Care System for not urinating in the previous sixteen hours and concern that his kidneys were shutting down. All of P.O.C.'s lab work was within normal limits, but he was given 1,000 liters of fluid to "get ahead of the game."

living that he needs to perform in order to remain healthy. Dr. Shupe testified that P.O.C. could be described as having a severe, abnormal mental, emotional, or physical distress; that P.O.C. was not functioning independently at the time of trial; and that P.O.C. was exhibiting an inability to live safely in his home.

Dr. Shupe opined that P.O.C.'s prognosis would be poor if he were released on the day of the hearing because he was not taking medicine while in the hospital, would not take medication on his own, was angry with his family, and was not planning to return home. Dr. Shupe testified that it was in P.O.C.'s best interest to get back on his medication so that he could begin functioning again. Dr. Shupe recommended that P.O.C. remain in court-ordered inpatient treatment and receive court-ordered medication. According to Dr. Shupe, no less restrictive means existed to treat P.O.C. at the time of trial because P.O.C. was not eligible for outpatient treatment as a result of his past conduct in refusing fluids.

### 2. P.O.C.'s Sister's Testimony

S.C. testified that her father, her sister, and her brother P.O.C. live with her. S.C. testified that she runs a real estate business and that P.O.C. had worked with her.

S.C. testified that P.O.C.'s mental illness started six years ago when their mother passed away. S.C. testified that P.O.C. had previously been treated at Green Oaks and at Terrell. P.O.C. was last treated at Terrell one and a half or two years ago; when he came home, he took his medication. When P.O.C. takes

8

his medications, he goes about his normal activities like everyone else.  When he quits taking his medications, he acts "very bizarre, very irrational" and does not make sense when he communicates.  S.C. said that P.O.C. had not taken his medication in four or five months.

When P.O.C. stopped taking his medications, he started copying the FBI and the IRS on business emails, he emailed the IRS and the FBI and copied S.C. on the emails, and he emailed the White House.  P.O.C. also started calling the CIA and the FBI, saying, "I'm going to complain to them, and we'll see.  We'll see what happens."  S.C. asked P.O.C. to tell her what the problem was, but she did not understand his answer.  P.O.C. eventually closed their business bank account and emailed the real estate agents that they employed to tell them that their checks would bounce.  P.O.C. thereafter put a message on S.C.'s Twitter and Facebook accounts, as well as his cell phone, saying, "Bank of Texas is filing a case against me."

S.C. testified that prior to his recent hospitalization, P.O.C. had called the police eleven times to tell them to take S.C. away because he believed she posed a danger to him.  P.O.C. posted big signs around the interior of the house stating, "Close the door gently," and he posted three signs on his bedroom door saying, "Do not knock, do not call my name.  If you need to talk to me, take an appointment."  P.O.C. also posted a sign outside on the exterior door of the house that said:  "Nobody should enter this house.  If you need to meet my dad, call him and meet him at Starbucks."  S.C. testified that P.O.C. had locked his

9

bedroom door and had refused to come out for several days, that he would not eat, and that he had gone to the neighbors' houses at random and had started rambling. S.C. was afraid of what the neighbors might do to P.O.C. if he did not leave when asked.

S.C. testified that she was present when the police removed P.O.C. from her home. S.C. said that P.O.C. had not eaten in at least ten days when the police took him to NTSH.

S.C. tried to communicate with the social workers and the doctors at NTSH, but they would not speak with her because P.O.C. had told them not to speak with his family. When S.C.'s sister and dad went to visit P.O.C., he refused to see them. S.C. said that she would allow P.O.C. to return to her home but that it was not safe for him to return home at the time of trial because he was a danger to himself and did not currently have the ability to make independent decisions regarding his medical treatment.

### 3. P.O.C.'s Testimony

P.O.C. testified that he is originally from India and that he moved to the United States at age nineteen. He received his bachelor's degree in economics from the University of Texas at Austin.

P.O.C. explained that he closed the business bank account because he and S.C. had been having disagreements regarding the profitability of her company for a few months and because he was authorized to close the account. P.O.C. testified that the disagreements over the business centered on S.C. not

10

being organized; he is "quite organized" and plans his days and does his work. P.O.C. believed that more organization was needed for the business to be successful.

P.O.C. said that he had been taking a few fluids, that he had not been eating for a few days, but that he had been eating a few weeks prior to the trial. He explained that he was trying to adjust his diet to eliminate processed foods.[4] He testified that he wants fresh food, preferably organic or grown naturally, because he is from India where most food is unprocessed. He said that he feels like eating unprocessed foods is more healthy in the long run. P.O.C. said that Mahatma Ghandi and Potti Sri fasted for more than fifty days in the sun without air conditioning, "and nothing happened to them." But he said that he did not want to fast like they did; he wants to fast "where I know that I can take care of my health and my nutritional values are stable and such."

P.O.C. testified that there is no reason for S.C. to be afraid of him because he is not a harmful person and is not harming himself by denying his body certain

_____

[4]The exhibits admitted at trial reveal that P.O.C. gave a variety of reasons for not eating. Dr. Isachievici's progress notes from June 25, 2013, state that P.O.C. said that he had stopped eating to help his sister lose weight. The nurse's progress note on July 5, 2013, states that P.O.C. said, "My God does not want me to eat." Dr. Olayemi's progress notes from July 10, 2013, state that P.O.C. admitted that he was starving and explained that he was not eating to prove to his sister that she can lose weight by eating less. Dr. Olayemi's progress notes from July 12, 2013, state that P.O.C. told the dietician that he was refusing to eat because he was upset with an undisclosed staff member at NTSH. He would not disclose what he was upset about. Nurse Comstock's notes from July 12, 2013, state that P.O.C. said he was refusing to eat because the psychiatrist, the social worker, and the staff of NTSH have lied to him.

11

foods.  P.O.C. said that if S.C. is afraid, it might be a good idea for him to stay away.

P.O.C. acknowledged that his medical records indicate he does not have as much social interaction as the doctors want him to; he explained that he is contesting being in a mental hospital and that is why he is not communicating with patients in the hospital who have issues.

P.O.C. testified that he did not feel like he was mentally ill because he does not hit his head, does not hear voices, and does not have illogical thinking; thus, he did not need to take medication on the date of the trial.  He did not intend to return to the hospital and does not want to live with his family anymore; he said that he would go to a hotel.

### 4.  Sufficiency Analysis

Although P.O.C. argues that "his behavior is within stable ranges" and that "his present ideas and behaviors are consistent with his cultural pas[t], his conceptualizations, and projections for his future," the testimony from the trial, which is set forth above, proves otherwise.  Here, P.O.C. testified that he was not mentally ill, but the jury also heard testimony from Dr. Shupe and S.C. about P.O.C.'s history of mental illness and heard Dr. Shupe testify that three medical professionals had diagnosed P.O.C. with the mental illness schizophrenia.  And although P.O.C. testified that his "fasting" was in line with other cultural icons, the evidence revealed that he is causing serious harm to himself because his body mass index is more than twenty percent below where it should be, which will

12

cause his body to start eating away his muscles and other organs to get nutrition in order to survive. The record thus contains clear and convincing evidence: Dr. Shupe's expert testimony about P.O.C.'s mental illness is supported by testimony from S.C. and the medical records, as well as P.O.C.'s own testimony, and the record as a whole demonstrates that P.O.C. is exhibiting a continuing pattern of behavior that tends to confirm the likelihood of serious harm to P.O.C. *See* Tex. Health & Safety Code Ann. § 574.034(d).

Having reviewed the evidence in a neutral light, we cannot conclude that the disputed evidence, including P.O.C.'s testimony that he does not feel mentally ill and that his "fasting" is culturally acceptable, is so significant that the jury could not have reasonably formed the firm conviction or belief that P.O.C. is mentally ill and that as a result of his mental illness, he is likely to cause serious harm to himself. *See C.H.*, 89 S.W.3d at 25, 27–29; *E.E.*, 224 S.W.3d at 795 (holding evidence factually sufficient to support findings that proposed patient was mentally ill and that as a result of the mental illness was likely to cause serious harm to herself by fasting).[5] We overrule the portion of P.O.C.'s sole

_____

[5]Because we have held the evidence factually sufficient to support the jury's finding under 574.034(a)(2)(A) and because only one subparagraph under section 574.034(a)(2) is needed to support a temporary commitment, *see* Tex. Health & Safety Code Ann. § 574.034(a); *Mezick*, 920 S.W.2d at 430, we need not determine whether the evidence is also factually sufficient to support the jury's finding under section 574.034(a)(2)(C). *See* Tex. R. App. P. 47.1 (stating that appellate court need only address every issue necessary to final disposition of appeal).

issue challenging the factual sufficiency of the evidence to support the judgment committing him to NTSH for temporary inpatient mental-health services.

## IV. ORDER AUTHORIZING ADMINISTRATION OF PSYCHOACTIVE MEDICATIONS

P.O.C. requested an eleven-day extension to file his brief so that the court reporter could prepare the supplemental record of the subsequent hearing concerning the psychoactive medication order. P.O.C.'s sole issue challenges the factual sufficiency of the evidence to support the trial court's findings in "ordering involuntary commitment to North Texas State Hospital of 90-days with medication." But P.O.C.'s brief does not set forth any argument or analysis challenging the psychoactive medication order. Therefore, to the extent that P.O.C.'s sole issue may be construed as including a challenge to the factual sufficiency of the evidence to support the psychoactive medication order, we overrule this contention as inadequately briefed. *See* Tex. R. App. P. 38.1; *Fredonia State Bank v. Gen. Am. Life Ins. Co.*, 881 S.W.2d 279, 284 (Tex. 1994).

## V. CONCLUSION

Having overruled P.O.C.'s sole issue, we affirm the trial court's judgment committing him to NTSH for inpatient mental-health services and, to the extent that it is before us, the order to administer psychoactive medication.

PER CURIAM

PANEL: WALKER, GARDNER, and MCCOY, JJ.

DELIVERED: October 3, 2013

14